James L. Meldon v. Commissioner. Theo. J. Ely Manufacturing Company, James L. Meldon, Receiver v. Commissioner.
Meldon v. Commissioner
Docket Nos. 30426, 30433.
United States Tax Court
1953 Tax Ct. Memo LEXIS 73; 12 T.C.M. (CCH) 1236; T.C.M. (RIA) 53353; October 30, 1953
Enoch C. Filer, Esq., 1005 Arial Building, Erie, Pa., for the petitioners. Fortescue W. Hopkins, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies and penalties as follows: Docket No. 30433
5%
Negligence
Year
Deficiency
penalty
Income tax
1942
$4,415.98
$220.80
Declared value ex-
cess profits tax
1942
2,686.22
134.31
Docket No. 30426
Income tax
1943
27,610.30 By amended answer the respondent requested the imposition of a 50 per cent addition *74 to the tax for fraud under section 293(b) of the Internal Revenue Code, in the amount of $13,805.15. By a second amended answer filed subsequent to the hearing the respondent requests that the deficiency be increased to the amount of $49,846.08 and a 50 per cent addition to the tax for fraud in the amount of $24,966.12. In Docket No. 30433, Theo. J. Ely Manufacturing Company, James L. Meldon, Receiver, petitioner, a preliminary question presented is whether the Court lacks jurisdiction of this proceeding on the ground that the petition was filed after the appointment of a receiver for the taxpayer. In Docket No. 30426, James L. Meldon, petitioner, the issues are: (1) what amount is includible in the petitioner's gross income for the taxable year 1943, by reason of distributions made to him out of the proceeds from the sale of assets of the Theo. J. Ely Manufacturing Company; and (2) whether the deficiency in income tax owing by James L. Meldon, for the taxable year 1943, is due in whole or in part to fraud with intent to evade tax, thereby subjecting him to a 50 per cent addition to the tax. The stipulated facts are found accordingly. Since the jurisdictional *75 issue relates only to the proceedings in which Theo. J. Ely Manufacturing Company, James L. Meldon, Receiver, hereinafter referred to as Ely Company, is petitioner, the facts and opinion in each proceeding will be treated separately. Docket No. 30433 Findings of Fact The Ely Company is a Pennsylvania corporation organized in 1908. On September 12, 1934, the Court of Common Pleas of Erie County, Pennsylvania, appointed James L. Meldon a permanent receiver with authority to operate the business of the corporation. Meldon duly qualified as receiver and continued to operate the business, and at the time of the hearing of this proceeding he had not been discharged as such receiver. Meldon, as receiver, filed income tax returns for Ely Company for the years 1934 to 1943, inclusive. The return for the taxable year 1942, involved herein, was filed with the collector of internal revenue for the twenty-third district of Pennsylvania. A deficiency was determined against Ely Company and a notice of deficiency was sent to "Theo. J. Ely Manufacturing Company, James L. Meldon, Receiver," on June 15, 1950. On September 11, 1950, a petition was filed by the receiver for a redetermination *76 of the deficiency. At the commencement of the hearing of these proceedings on May 12, 1952, Ely Company, by its receiver, filed a motion to dismiss its petition for review on the ground that the Court lacked jurisdiction. Decision on the motion was reserved. Opinion LEMIRE, Judge: Section 274(a) of the Internal Revenue Code provides, in part, that no petition shall be filed with this Court after the adjudication of bankruptcy or the appointment of a receiver. Where it appears that the petition is filed subsequent to the appointment of a receiver, it has been repeatedly held that we have no jurisdiction. Louis H. Pink, Supt. of Insurance of New York, 38 B.T.A. 182; Molly-'es Doll-outfitters, Inc., 38 B.T.A. 1; Banco Di Napoli Agency in New York, 1 T.C. 8. The respondent argues that the cited cases do not control the case at bar because they involve deficiencies determined prior to the appointment of a receiver, while, in the instant case, the receiver was carrying on the business of the corporation. To so hold would, in our opinion, override the plain mandate of the statute. The respondent further argues that the *77 receiver having filed his petition invoking the jurisdiction of the Court should not be permitted to deny its jurisdiction. It is elemental that where the jurisdiction of the Court is limited by statute the parties cannot confer jurisdiction by consent or otherwise. Alfred C. Ruby, 2 B.T.A. 377; Mohawk Glove Corp., 2 B.T.A. 1247; Accessories Manufacturing Co., 12 B.T.A. 467. We, therefore, hold that this Court is without jurisdiction of this proceeding. Docket No. 30426 Findings of Fact The petitioner, James L. Meldon, is an individual residing in Erie, Pennsylvania. His income tax return for the taxable year 1943 was filed with the collector of internal revenue for the twenty-third district of Pennsylvania on a cash basis. During the years 1918 to 1924, Meldon was employed as an internal revenue agent and eventually rose to the position of assistant internal revenue agent in charge at Pittsburgh, Pennsylvania. After severing his connection with the Bureau he built up a successful accounting practice. He filed many income tax returns for individual and corporate taxpayers and represented taxpayers before the administrative officers *78 of the Bureau. On September 12, 1934, Meldon was appointed by the Court of Common Pleas of Erie County, Pennsylvania, as permanent receiver of Theo. J. Ely Manufacturing Company, with principal offices in Girard, Pennsylvania. As receiver, he was authorized by the court to continue the operation of the business of the corporation then engaged in the manufacture of wood and metal products. Meldon filed a bond and duly qualified as receiver and has not been discharged. At the time of the appointment of a receiver the issued and outstanding shares of the capital stock of Ely Company consisted of 290 shares, of which J. A. Ellis owned 240 shares and Ida R. Ellis owned 50 shares. Of the shares owned by J. A. Ellis, 50 were held by the Girard National Bank as collateral security for his personal note of $5,000. At the time of Meldon's appointment as receiver the accounts payable of Ely Company were as follows: To J. A. Ellis
$3,752.44
To trade
5,842.97
To others
372.61
$9,968.02
The mortgages payable were as follows: To Girard Development Company
1st mortgage
$ 3,000.00
To Girard National Bank
2nd mortgage
16,372.91
To Mary A. Woodman
3rd mortgage
6,000.00
$25,372.91
*79 On October 11, 1934, Meldon entered into a written agreement with J. A. Ellis and Ida R. Ellis to the effect that he would receive 50 per cent of their stockholdings if the operations of Ely Company were successful and the Company was returned to the stockholders. On May 30, 1938, J. A. Ellis died testate. The named executrix, Mary A. Woodman, declined to qualify and W. B. Hicks was appointed administrator. W. B. Hicks became deceased, and on May 11, 1939, C. M. Drury qualified as administrator. At that time Drury was attorney-in-fact for the Girard Development Company and one of the liquidating trustees of the Girard National Bank. Early in 1939 Meldon purchased from Drury the first mortgage for the face amount of $3,000, plus accrued interest $406of, and the second mortgage in the amount of $16,372.91 for the sum of $12,090. The assignments of the first and second mortgages were not recorded in the mortgage book of Erie County, Pennsylvania. During 1939 Meldon was reimbursed by Ely Company in the amount of $3,406, the amount he paid for the assignment of the first mortgage. During the year 1939 Meldon paid the sum of $630.02 to acquire the accounts payable to general creditors *80 owing at the time of his appointment as receiver. On or about September 12, 1939, Meldon filed a verified petition in the Court of Common Pleas of Erie County, Pennsylvania, in a proceeding entitled, "In the Matter of the Receivership of Theodore J. Ely Manufacturing Company," reading as follows: "TO THE HONORABLE THE JUDGES OF SAID COURT: "The petition of James L. Meldon, receiver of the Theodore J. Ely Manufacturing Company would respectfully represent: "1. That he is the duly appointed, qualified and action receiver of the above company under an order of the Court of Common Pleas of Erie County, Pennsylvania. "2. That at the time of his appointment the amount of his bond was fixed in the amount of $10,000.00 upon which a premium of $50.00 annually has to be paid. "3. Petitioner avers common debts of said company and that said receivership is ready to be returned to the stockholders of said company but there are only two stockholders to-wit, Jay Ellis who died a year ago and the other stockholder to-wit, Mrs. I. R. Ellis has not been located. "4. That there is no necessity for a bond of $10,000.00 and no necessity of a bond in excess of $1000.00. "WHEREFORE, your *81 petitioner respectfully prays your Honorable Court to reduce the amount of his bond as receiver to $1000.00." On October 12, 1939, the court made an order granting the prayer of petitioner and fixed the bond in the sum of $1,000. Prior to 1940 C. E. Carter, doing business as C. E. Carter Company, was engaged in the manufacture of toys in a part of the property of Ely Company under a lease agreement with the receiver. The Carter Company assets consisted of machinery, dies, equipment, and inventory located on the property of Ely Company and finished manufactured articles stored in a warehouse in Girard. During the period July 19, 1940, and December 13, 1940, Meldon individually advanced to the Carter Company for pay roll costs the amount of $15,681.02. In June 1941 C. E. Carter turned over all of the machinery, equipment, and inventory of the C. E. Carter Company to Meldon in cancellation of his indebtedness. The Harrington Machine Tool Company, located in North Girard, Pennsylvania, manufactured bolts which were used in the products manufactured by Ely Company. The owner of the HarringtonCompany died and Meldon acquired, on February 20, 1941, all of the business and assets of *82 the company for the sum of $2,815. The assets were thereupon transferred to the plant of Ely Company. On March 28, 1942, Meldon entered into a contract with Carl Bernie Oas, reading as follows: "This agreement, made and concluded this 28th day of March, 1942, between James L. Meldon, of Erie, Pennsylvania, owner and receiver of the Theodore J. Ely Manufacturing Company, of Girard, Pa., and Carle Bernie Oas, of Silverton, Oregon, witnesseth: "That James L. Meldon, hereinafter referred to as the party of the first part, having offered for sale to Carl Bernie Oas, hereinafter called the party of the second part, all of the assets and business of the said Theodore J. Ely Manufacturing Co., including the business and assets carried on by said first party under the name of Harrington Machine Tool Company, and the business and assets of the Erie City Manufacturing Company, insofar as the business and assets relates to the so-called 'Mop Account' of the said Erie City Manufacturing Co., acquired by said first party from the present Erie City Manufacturing Co., a Pennsylvania corporation, whose registered address and plant is Erie, Pennsylvania, part of which contract from the Erie City *83 Manufacturing Co. reads: '12. It is agreed that the Erie City Manufacturing Co. shall not hereafter engage in the manufacture and sale of products which are now being manufactured by the Theodore J. Ely Mfg. Co. of Girard, Pennsylvania, unless the said Company authorizes the Erie City Manufacturing Co. to do so in writing.' also the business and assets of the former C. E. Carter Co., now owned and carried on under the name of the said Theodore J. Ely Mfg. Co. The agreed price is Twenty-five Thousand ($25,000.00) Dollars, plus the value of the Cash on Hand and on Deposit, Notes and Accounts Receivable, Merchandise and Other Inventories of Supplies on hand on April 30th, 1942. The total purchase price will be the value of the above and is to include all assets on the property on April 30th 1942, and the purchase price to include a clear title to all the assets which is free and clear of all indebtedness or liabilities. "1. It is agreed that the sale is to be as of May 1, 1942. "2. It is agreed that the payment for the above described property will begin May, 1942, and is to be fully paid for on or before May 1, 1952. "3. It is agreed that the payment is to be made in installments *84 of Two Hundred ($200.00) Dollars per week, beginning May 1, 1942 until payments total the amount of the selling price to be determined as of April 30, 1942, plus interest of Five (5%) percent per annum on the remaining unpaid purchase price. "4. It is agreed that the party of the first part will cooperate in the financing of the business of the Ely Mfg. Co., to an extent that on a sound and efficient basis and under capable management the business will be expanded to enable the party of the second part to fulfill his obligation. "5. It is agreed that the party of the second part shall be privileged on declaration to make any of the payments on the principal and interest from personal funds. "6. It is agreed that if for reasons of good business practice it is impractical to withdraw from the funds at any particular time the payments on principal provided for in section three (3) the party of the first part will permit said payments on principal to accrue for a reasonable period of time so long as the management of the affairs of the Theo. J. Ely Mfg. Co. is capable and such action appears to be to the best interest of the said company, and this agreement will not become null and *85 void during that time, but the terms of payment of the purchase price as stated in paragraph 3 shall not be later than May 1, 1952. "7. It is agreed that any and all profits earned by the Theo. J. Ely Mfg. Co., commencing May 1, 1942 shall accrue to the second party and will continue to accrue to the second party so long [as] the terms of payment and interest thereon shall have been fulfilled. "8. It is agreed that the second party shall withdraw seventy-five ($75.00) dollars per week from the funds of the Theo. J. Ely Mfg. Co. and shall share in the rights, benefits and privileges of the agreement so long as he devotes his exclusive and undivided time to the business and affairs of said company. "9. It is agreed that in the event the profits of the Theo. J. Ely Mfg. Co. shall exceed in any one year the total annual payments plus interest then the second party may draw from the profits after the close of the Company's fiscal year an amount not to exceed twenty (20%) percent of said profits, which will be in addition to the weekly withdrawal provided for in section eight (8)." On May 1, 1942, Carl Bernie Oas took possession of all of the assets of Ely Company, continued to *86 operate the same, and received all the avails of such operations. After the close of the year, December 31, 1942, the parties agreed that the total purchase price was to be fixed at $75,000. Pursuant to the agreement of March 28, 1942, Carl Bernie Oas made payments on the purchase price on the dates and in the amounts as follows: 1942
1943
1944
January
$ 1,084
$4,860
February
1,556
March
2,700
April
3,100
May
$ 1,800
2,000
June
1,262
15,714
July
1,440
4,800
August
1,112
6,700
September
1,012
10,000
October
3,140
2,300
November
1,112
4,700
December
1,468
3,140
$12,346
$57,794
$4,860
1942
$12,346
1943
57,794
1944
4,860
Total
$75,000
In March 1945 Meldon, as receiver, filed a verified answer in a civil action instituted in the District Court of the United States for the Western District of Pennsylvania by Chester Bowles, Administrator, Office of Price Administration, plaintiff, against Theo. J. Ely Manufacturing Company, James L. Meldon, receiver thereof, and Carl Bernie Oas, etc., defendants. The answer, inter alia, alleges as follows: "Further answering, he avers that under agreement dated *87 as of the 28th day of March, 1942, he as owner and Receiver of the Theo. J. Ely Manufacturing Company of Girard, Pennsylvania, sold all of his interest in the plant, machinery, and assets of the business of the said Theo. J. Ely Manufacturing Company to Carl Bernie Oas, and that the said Carl Bernie Oas, on May 1, 1942, took possession of all of said assets and has been exclusively engaged in the manufacture of the items abovementioned, and that he, the said James L. Meldon, either as Receiver or otherwise, has not had any connection with the manufacture and/or sale of any of the items above mentioned." * * * During the year 1936 Ida R. Ellis became an inmate of the Masonic Home in Elizabethtown, Pennsylvania, and died there intestate in 1938. As is customary in the State of Pennsylvania, Ida R. Ellis when admitted turned over to the trustees of the Masonic Home all of her worldly goods, including the 50 shares of Ely Company stock in return for an agreement to care for her during the remainder of her life. On January 22, 1943, Meldon purchased from the trustees of the Masonic Home the 50 shares of stock of Ely Company for the sum of $75. On March 5, 1943, Meldon purchased from *88 the Girard National Bank for $75 the 50 shares of stock of Ely Company which it held as collateral security for the personal loan of J. A. Ellis. On May 28, 1943, Meldon purchased from C. M. Drury, Administrator of the Estate of J. A. Ellis, 190 shares of capital stock of Ely Company for the sum of $285. In order to comply with the conditions of the agreement of March 28, 1942, whereby all the real estate, machinery, and equipment would be free and clear of all liens and claims, and in order to divest an outstanding third mortgage in favor of Mary A. Woodman in the face amount of $6,000, Meldon instituted foreclosure proceedings in the Court of Common Pleas of Erie County as Nos. 162 and 163, May Term D.S.B. 1943, and sold the property at sheriff's sale to James L. Meldon, as evidenced by deeds recorded in Erie County deed book 393, pages 360 and 361. On August 12, 1943, judgment was entered on the bonds accompanying the first and second mortgages, and the properties were sold by the sheriff of Erie County, who executed and delivered sheriff's deeds conveying the properties of Ely Company to James L. Meldon, thereby divesting the third mortgage of $6,000 owned by Mary A. Woodman. *89 In his individual income tax return for the year 1944, Meldon included in the schedule of capital gains and losses the following: Sales
Long-term
Acquired
Sold
price
Cost
gain or loss
290 shares
Ely Mfg. Co.
1938
1-4-44
$76,000
$38,523.25
$37,476.75G
As of April 30, 1942, Ely Company was indebted to James L. Meldon, individually, in the amount of $27,731.12, for advances made to it computed as follows: To purchase old accounts payable
$ 630.02
To purchase 2nd mortgage
12,090.00
To purchase Harrington assets
2,815.00
To purchase Carter assets
15,681.02
Total
$31,216.04
Less Meldon's individual indebtedness
to Ely Company
3,484.92
$27,731.12
In the taxable year 1943 the petitioner, James L. Meldon, received additional gross income from Ely Company by way of distributions in complete liquidation in the amount of $41,973.88, no part of which was reported by him on his return for such taxable year. The deficiency in income tax owing by petitioner James L. Meldon for the taxable year 1943 is due in part to fraud with intent to evade tax. Opinion The first question presented involves the amount includible *90 in the petitioners' gross income for the taxable year 1943 by reason of gains derived from distributions made to petitioner by Ely Company. The facts presented by this record are in such a state of confusion and contradiction that it is practically impossible to rationalize the various contentions of the respective parties. To attempt to do so would in our opinion only result in confusion more confounded. The respondent's shift in his position from the deficiency originally determined prevents the application of the rule of presumption of its correctness. After considered analysis of the record we have set forth in our findings of fact such facts as we think the record supports. We are convinced that the just solution is to be found in a realistic and practical approach to the problem. Meldon was the duly appointed receiver of the company with authority to continue the operation of the business of Ely Company. From the date of his appointment in September 1934 until April 30, 1942, when the assets of the company were sold to Carl Bernie Oas, he continued to operate the company. At the time of the hearing of this proceeding in May 1952, Meldon had not been discharged as such receiver. *91 A receiver has a fiduciary relationship both towards the court and persons interested in the estate. In re Singer Furniture Corp., 47 Fed. (2d) 780. It is a well settled rule that a trustee can make no profit out of his trust. The purpose of the rule is to provide against any possible selfish interest exercising any influence which can interfere with the faithful discharge of his duty which is owing in a fiduciary capacity. Magruder v. Drury, 235 U.S. 106; Michoud v. Girod, 4 How. 503-505; 45 American Jurisprudence, § 132. While a receiver, who is authorized by the court appointing him to continue operating the business under his control, may advance his own individual funds to assure the continuation of the business, he may not purchase for his individual benefit and profit the obligations of the company of which he is receiver. This record reveals that Meldon did acquire during his receivership the old accounts payable by Ely Company at the time of his appointment, in the amount of $9,968.02, for the sum of $630.02; and that he obtained an assignment of the first mortgage in the amount of $3,000, plus accrued interest of $406, for *92 the payment of the sum of $3,406, and the second mortgage in the amount of $16,372.91 for the payment of the sum of $12,090. The petitioner was reimbursed by Ely Company in the amount of $3,406, which he had paid for the assignment of the first mortgage. Since the petitioner treated the funds he individually advanced to acquire an assignment of the first mortgage as advances for the benefit of Ely Company, we think it fair and reasonable to treat the payment of the $12,090 to acquire the assignment of the second mortgage and the payment of $630.02 to obtain an assignment of the claims of general creditors as advances by the petitioner for the benefit of Ely Company in order to assure its continued operation. To the extent of the amounts so advanced the petitioner became a creditor of Ely Company. During the period of the receivership Meldon individually acquired the assets of the Harrington Machine Tool Company for the sum of $2,815. That company manufactured parts required by Ely Company in the manufacture of its products, and Meldon moved the machinery and equipment to the plant of Ely Company where it was commingled with the machinery and equipment of that company. The Harrington *93 assets were not reflected on Ely Company's balance sheet; they were included in the sale to Carl Bernie Oas. Under the circumstances we have treated the sum of $2,815 as an advance by the petitioner for the benefit of Ely Company. A somewhat similar situation exists with respect to the acquisition of the assets of the C. E. Carter Company. The record establishes that both Ely Company and Meldon, individually, advanced funds to the Carter Company which occupied a portion of the property owned by Ely Company. It has been stipulated that Meldon, individually, advanced to the Carter Company for pay roll expenses the amount of $15,681.02 between July 19, 1940, and December 13, 1940, and that Carter turned over the machinery, equipment, and inventory to Meldon in cancellation of his indebtedness. These assets likewise were not carried on the Ely balance sheet but were commingled with the assets of that company and were included in the lump sum sale. Therefore, we have also treated the amount of $15,681.02 as an advance by Meldon, individually, for the benefit of Ely Company. The record further shows that it was the common practice of Meldon to individually advance to Ely Company from *94 time to time funds for current operations during his receivership. The account of Meldon with Ely Company shows that as of April 30, 1942, the day preceding the date when Carl Bernie Oas took possession of the assets of Ely Company under the contract of sale dated March 28, 1942, the amounts credited to Meldon amounted to $31,525.09 and the debits shown were $16,072.15. Included among the credits was the amount of $9,968.02, representing the old accounts payable by Ely Company at the time of the appointment of the receiver, and the amount of $2,000, representing an alleged receiver's fee. We think it is clear that these amounts were never received by Meldon and were improper credits. These two improper credits, totaling $11,968.02, should be deducted from the total credits shown of $31,525.09, making the correct amount of credit $19,557.07. Since the total debts of $16,072.15 were less than the corrected credit, Meldon was indebted to Ely Company in the amount of the difference, or the sum of $3,484.92. From the advances hereinabove set forth, totaling $31,216.04, there should be deducted Meldon's indebtedness of $3,484.92, leaving a resultant figure of $27,731.12. We have found as *95 a fact that Meldon is entitled to receive from the proceeds of the sale the amount of $27,731.12, as a creditor of Ely Company. During the years 1942 and 1943 Ely Company received on the purchase price of $75,000 payments aggregating $70,140. Meldon, who was on a cash basis, appropriated these payments to his personal use as and when received by Ely Company. Of the sum of $70,140, the amount of $27,731.12 is to be treated as a distribution to Meldon as a creditor of Ely Company. The balance of $42,408.88 remainded, in the taxable year 1943, for distribution to stockholders. Between January 22, 1943, and May 28, 1943, Meldon acquired all of the oustanding shares of Ely Company at a total cost of $435. Within a period of less than six months after the acquisition of the said 290 shares, Meldon received in the taxable year 1943 the difference between the sum of $42,408.88 and the cost basis of his stock in the sum of $435, or the sum of $41,973.88, as a distribution in complete liquidation, and such amount is includible in his gross income for 1943 as a short-term capital gain, and we have so found as a fact. In his return for 1943 Meldon did not report any part of such gain in his *96 gross income. The final question presented is whether any part of the deficiency for the taxable year 1943 is due to fraud with intent to evade tax so as to require the imposition of the 50 per cent addition to the tax, as provided by section 293 (b) of the Internal Revenue Code. In the light of the entire picture revealed by this record, we are convinced that a part of the deficiency is due to fraud with intent to evade the tax and have so found. Although we have not deemed it necessary to set forth in our findings of fact all of the documentary proof and other evidence bearing upon the question of fraud, this record is so replete with misrepresentations and false information furnished by Meldon to the taxing authorities and to the court having jurisdiction of the receivership, as well as evasive and contradictory testimony, which so affect his credibility as a witness that we are unwilling to give full credence to his testimony. The petitioner contends on brief that, since he treated the transaction as a sale of his stock and reported a long-term capital gain in 1944, his failure to report any gain in the taxable year 1943, if it is held to be includible *97 in that year, was due to error and there was no intent to evade tax. Upon this record the argument does not impress us. Meldon was a former agent of the Bureau of Internal Revenue and an accountant with a very considerable tax practice. It is therefore reasonable to presume his familiarity with the taxing statutes and the Treasury regulations. Notwithstanding his experience this record reveals that the petitioner did not keep accurate records and failed to preserve and protect the books and records of the various companies involved to enable their production at the trial. In our opinion, the conduct and acts of the petitioner were deliberate and with the intent to evade the payment of his correct tax liability. Therefore, we hold that the respondent properly determined that the petitioner is liable for the 50 per cent addition to the deficiency for fraud with intent to evade tax. An order will be entered dismissing Docket No. 30433 for lack of jurisdiction. Decision will be entered under Rule 50 in Docket No. 30426.